**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| John McQuillin,<br><br>                              **Plaintiff,**<br>      - against -<br><br>**Hartford Life and Accident Insurance**<br>**Company,**<br><br>                              **Defendant.** | **20-cv-2353**<br><br>**COMPLAINT** |

The plaintiff, John McQuillin, by his attorneys, Law Offices of Jeffrey Delott, for

his Complaint against the defendant, Hartford Life and Accident Insurance Company

("Hartford"), alleges as follows:

**NATURE OF ACTION**

1.      Plaintiff seeks to recover long term disability ("LTD") benefits pursuant to

the terms and conditions of the Group Long Term Disability Plan for Employees of

Wright Medical Group (the "LTD Plan").

**THE PARTIES**

2.      Plaintiff, who was born November 30, 1963, resides at 37 Prospect Street,

Glen Head, NY 11545, and worked for Wright Medical Technology Inc. (the "Employer")

until February 17, 2019.  The Employer sponsored the "LTD Plan," and is the Plan

Administrator.  Plaintiff was covered under the LTD Plan when he became disabled.

3.      Hartford is licensed to conduct the business of insurance in the State of

New York, and is located at One Hartford Plaza, Hartford, CT 06155.  Hartford not only

issued the insurance policy that is responsible for paying benefits under the LTD Plan,

but also decides if claimants are entitled to benefits under it, which creates a financial conflict of interest.  The conflict of interest results in Hartford employing unwarranted tactics to justify denying claims that should be paid under the LTD Plan.

## JURISDICTION & VENUE

4.      Jurisdiction is based upon 29 U.S.C. §§ 1132(e)(1) and 1132(f), which give the District Courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan, to enforce rights under the terms of the plan, or to clarify rights to future benefits under the terms of the plan.  In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

5.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2), which allows an action under Title I of Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"), to be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found.  The breach took place in Glen Head, NY where Plaintiff was supposed to receive the LTD benefits.

## THE LTD PLAN

6.      The LTD Plan provides a monthly benefit for covered employees if they show they remain disabled after a 180 day elimination period, by submitting proof of loss.  Plaintiff's 180 day elimination period ended August 16, 2019.

7.      Under the LTD Plan, proof of loss may include:

1) documentation of:
    a) the date Your Disability began;
    b) the cause of Your Disability;
    c) the prognosis of Your Disability;
    d) Your Pre-disability Earnings, Current Monthly Earnings or any income,

including but not limited to copies of Your filed and signed federal and state tax returns; and
    e) evidence that You are under the Regular Care of a Physician;
2) any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;
3) the names and addresses of all:
    a) Physicians or other qualified medical professionals You have consulted;
    b) hospitals or other medical facilities in which You have been treated; and
    c) pharmacies which have filled Your prescriptions within the past three years;
4) Your signed authorization for Us to obtain and release:
    a) medical, employment and financial information; and
    b) any other information We may reasonably require;
5) disclosure of all information and documentation required by Us relating to Other Income Benefits;
6) proof that You and Your dependents have applied for all Other Income Benefits which are available; and
7) disclosure of all information and documentation required by Us in order to exercise Our Subrogation or Reimbursement rights.

        8.     Defendant never claimed that Plaintiff failed to comply with submitting

proof of loss.

        9.     The LTD Plan provides a 60% monthly benefit for covered employees if

they show they remain disabled after the 180 day elimination period, by submitting proof

of loss.

        10.    The LTD Plan defines Disability or Disabled as meaning:

    You are prevented from performing one or more of the Essential Duties of:

1) Your Occupation during the Elimination Period;
2) Your Occupation, for the 2 year(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3) after that, Any Occupation for which You are gainfully employed.

The end of the 24 month period for Plaintiff is August 16, 2021.  Thus, Plaintiff seeks

LTD benefits for being unable to perform one or more of the Essential Duties of his

Occupation.

## PLAINTIFF'S OCCUPATION

11.     Plaintiff sold foot/ankle surgical equipment for the Employer.  Among other things, Plaintiff was required to be present to assist in the operating room during surgery that used the foot/ankle equipment.  Plaintiff's annual salary was $100,000, which means his income will be reduced by $40,000, because the LTD Plan only provides for a 60% benefit.  Common sense dictates that Plaintiff is not faking or exaggerating his impairments in order to sustain such a large loss in his annual income.  Stated differently, Plaintiff would not misrepresent the severity of his medical condition in order to defraud Hartford out of LTD benefits since it results in his losing nearly half of his income.

12.     Seventy percent of Plaintiff's time at work was spent in the operating room.  Surgical procedures lasted from 30 minutes to seven hours.  The remainder of Plaintiff's time was spent on the road, delivering surgical equipment and meeting with prospective clients.  Work hours were long and quite varied, often extending into the evening and weekends.  The occupation is complex, and requires being able to multitask.

13.     According to O*Net Code, Plaintiff's occupation is Sales Representatives Medical 41-4011-00.05.  Surgical equipment medical sales representatives are typically responsible for instructing the medical staff in the proper use of the equipment, which requires that they are available to attend surgical procedures on a regular and consistent basis.  Additionally, they must be extremely detail orientated, reliable and able to handle stressful and unpredictable situations.  According to the Dictionary of

occupational Titles, Plaintiff's occupation was light, which requires lifting up to 20 pounds, and standing and walking 6 hours in an 8 hour work day.

14.     According to Defendant, the material and substantial duties of Plaintiff's occupation were conducting regular sales calls, which required travelling throughout the five boroughs of New York City, Long Island, and New Jersey, mastery of arthroplasty procedure, and ability to work in the operating room.

## STANDARD OF REVIEW

15.     Under ERISA, the default standard of review is *de novo*, and it applies unless there is a clear grant of discretionary authority for the entity that determines eligibility for benefits.  *Halo v. Yale Health Plan,* 819 F.3d 42, 52 (2d Cir. 2016), *Firestone v. Bruch*, 489 U.S. 101, 115 (1989).

16.     The Employer, as the plan administrator, "bears the burden of proving that the arbitrary and capricious standard of review applies, since 'the party claiming deferential review should prove the predicate that justifies it.'"  *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir.1999)

17.     In *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), the Supreme Court ruled that the policy*, i.e.,* the contract between the insurance company and the policyholder, is the relevant plan document to determine the plan terms and conditions.  The first reason why *de novo* review applies is that the policy Hartford issued to the Employer does not contain any clear grant of discretionary authority.

18.     The second reason why *de novo* review applies is that Hartford violated 29 C.F.R. § 2560.503-1.  Hartford failed to render a decision on a timely basis; *i.e.,* within 45 days, nor made a proper extension request.  *Halo,* 819 F.3d at 58; *McFarlane v. First Unum,* 274 F.Supp.3d 150, 155 (S.D.N.Y. 2017); *Hughes v. Hartford,* 368 F.Supp.3d 386, 394, 397-98 (D.Conn. 2019); *McConnell v. American General*, 2020 WL 292193, at *3 (S.D.Alab. 01/21/2020).

19.     Even if an arbitrary and capricious standard of review were to apply, the procedural irregularities, due to Hartford's conflict of interest, would weigh heavily against it.

## <u>SHORT TERM DISABILITY ("STD")</u>

20.     Hartford found Plaintiff was disabled under, and entitled to, New York State statutory STD benefits until August 26, 2019, which was the maximum duration for which those benefits were available.

21.     Hartford never explained what changed, let alone improved, after Plaintiff was found disabled and entitled to STD benefits under New York State law to justify denying LTD benefits.

22.     Hartford also found Plaintiff was disabled under, and entitled to, benefits under the Employer's STD Plan until August 26, 2019, which was also the maximum duration for which those benefits were available.

23.      After Hartford found Plaintiff was disabled and entitled to benefits under the Employer's and New York State's STD Plans, on four separate occasions, including August 22, 2019, Hartford never explained what changed, let alone improved, to justify denying LTD benefits after that date.

24.     Hartford reviewed the same information that was reviewed for STD benefits, yet denied Plaintiff's LTD application.

25.     Hartford could not identify a medical test, examination finding, or symptom that had changed to show that Plaintiff's medical condition had improved, which is a perfect example of Hartford's biased decision making due to its financial conflict of interest.

## MEDICAL EVIDENCE AND REVIEW

26.     On January 15, 2019, Plaintiff had a prostate fusion biopsy, which a January 20, 2019 pathology report revealed was positive for cancer.

27.     Dr. Herbert Lepor is a board certified urologist who specializes in treating prostate cancer at Smilow Comprehensive Prostate Cancer Center, which is part of NYU Langone's Perlmutter Cancer Center.  His clinical practice is exclusively devoted to surgical management of prostate cancer.  He has treated over 5,000 patients for prostate cancer.  Dr. Lepor is at the forefront of prostate cancer research using image-guided diagnostic techniques, such as MRI, to help determine the best treatment, whether surveilling a slow-growing cancer, completely removing the prostate, or destroying one malignant area in an outpatient procedure that has virtually no treatment-related complications.  Dr. Lepor regularly presents those innovations at academic meetings throughout the United States and the world.

28.     At the NYU School of Medicine, Dr. Lepor is Professor and the Martin Spatz Chairman of the Department of Urology; Professor of the Department of Biochemistry and Molecular Pharmacology; and the Urologist in Chief at Tisch Hospital. He received his medical degree from Johns Hopkins University, and completed his surgery and urology residency at Johns Hopkins Hospital.  He also serves as Chairman of Scientific Advisory Board at UroGen Pharmaceuticals, Ltd., and as a Member of Medical Advisory Board at Skyline Medical Inc. He has served on the editorial boards of four major urological journals.  Dr. Lepor has been published over 400 times,[1] including

---

[1] http://library.med.nyu.edu/api/publications/?person=leporh01&sort=display_rank&in-biosketch=true

over 300 peer review articles,[2] book chapters, and books, all related to prostate cancer and related matters.

29.     Dr. Lepor has repeatedly received the Compassionate Doctor Award, the Compassionate Doctor Recognition, Patient's Choice Award, Top 10 City Doctor Award, and Castle Connolly Top Doctor Award.  In 1995, he won the Gold Cystoscope Award from The American Urological Association.

30.     Dr. Lepor is a member of the American Association of Genitourinary Surgeons, Clinical Society of the American Association of Genitourinary Surgeons, the American Surgical Association, and the Johns Hopkins University Society of Scholars.

31.     On February 6, 2019, Plaintiff went to see Dr. Lepor for a second opinion regarding the prostate cancer.   Dr. Lepor discussed four options:  active surveillance ("AS"), radical prostatectomy ("RP"), radiation therapy ("RT") and focal ablation ("FA"). Dr. Lepor concluded the cancer was too advanced for AS.  Because Plaintiff was highly motivated to avoid any potential side effects of treatment, and to maintain his quality of life, Dr. Lepor suggested FA, even though it posed a greater risk that the cancer could spread compared to RP and RT.

32.     On February 12, 2019, Plaintiff went to see Dr. Hina Qureshi, who is board certified in Family Medicine, to follow up for prostate cancer and depression.  Plaintiff started treating with Dr. Qureshi on May 19, 2015.  She noted Plaintiff cried during the exam.  His other problems were back pain from lumbar disc degeneration, epicondylitis, obesity, and anxiety, including panic attacks, and she prescribed Xanax.  Dr. Qureshi advised Plaintiff to seek treatment from a mental health professional.  Dr. Qureshi's attending physician's statement ("APS") from that date stated that Plaintiff was unable to

---

[2] https://www.practiceupdate.com/author/herbert-lepor/535

8

return to work, and would have difficulty performing work duties due to urinary symptoms and mental illness.  The APS identified pathology reports and lab tests as the relevant objective test evidence.

33.     Plaintiff went to Dr. Qureshi on March 14, 2019, to get preoperative clearance for Dr. Lepor to perform FA of Plaintiff's prostate.  Plaintiff's medications were Xanax, Valium, and Metoprolol and Rosuvastatin, and Dr. Qureshi discussed Plaintiff's abnormal EKG.

34.     Dana Costanzo is Dr. Lepor's Nurse Practitioner.  She examined Plaintiff on March 19, 2019, in preparation for his prostate surgery with Dr. Lepor.  NP Costanzo noted Plaintiff would see his cardiologist on March 25, 2019.

35.     Dr. Lepor performed the FA and cystoscopy on April 1, 2019.  Plaintiff had ipsilateral GGG2 prostate cancer.

36.     Dr. Qureshi examined Plaintiff on May 6, 2019, for more medication for depression.  She noted Plaintiff had gained even more weight, and noted that he had abnormal EKG and stress tests.  She also diagnosed Plaintiff with vitamin D deficiency, which can lead to cancer.[3]

37.     On July 9, 2019, Dr. Lepor examined Plaintiff for a three month follow up after his surgery.  Dr. Lepor noted Plaintiff was having urgency incontinence.  Dr. Lepor prescribed Mirabegron, whose brand name is Myrbetriq.  Myrbetriq is prescribed to help loss of bladder control, need to urinate right away and often.[4]

38.     Plaintiff went to see Dr. Qureshi for anxiety on July 11, 2019.  Dr. Qureshi reported that for the last month, Plaintiff had been feeling dizzy, felt like the room was

---

[3] https://www.webmd.com/diet/guide/vitamin-d-deficiency#1
[4] https://www.mayoclinic.org/drugs-supplements/mirabegron-oral-route/side-effects/drg-20075675?p=1

spinning, and was having urinary urgency and frequency.  Dr. Qureshi added

Escitalopram Oxalate, which is used to treat anxiety and depression,[5] and Metformin,[6]

which is used to treat Type 2 diabetes, Alprazolam, Metoprolol, Mybetriq, and

Rosuvastatin.

39.     Dr. Qureshi completed an APS on July 22, 2019, and concluded that

Plaintiff would have difficulty performing any work duties due to urinary symptoms,

major depressive disorder, anxiety, panic attacks, vertigo and dizziness.

40.     Plaintiff went to see Dr. Lawrence Robinson, a board certified neurologist,

about the vertigo, on July 29, 2019.  The likely diagnosis was positional vertigo.

41.     On August 23, 2019, Hartford contended that Plaintiff's occupation was

sedentary, highly complex, high paying, and there was a low likelihood that Plaintiff is

qualified to perform any occupation other than his own.

42.     Plaintiff went to see Dr. Qureshi on September 24, 2019, for stress and

urinary urgency and frequency.

43.     On September 3, 2019, Plaintiff advised Hartford that he was no longer

employed with the Employer.  Therefore, since Plaintiff was approaching the maximum

duration of his STD benefit claim, Hartford sent Plaintiff an application for LTD benefits.[7]

44.      On September 11, 2019, Plaintiff averred that he was seeking LTD

benefits because he was unable to stay in the operating room for extended periods of

time due to urinary frequency and urgency, lack of concentration, and fatigue.  During a

---

[5]  Its side effects include trouble sleeping, drowsiness, dizziness, and tiredness.
https://www.webmd.com/drugs/2/drug-63989/escitalopram-oxalate-oral/details
[6]  Its side effects include gastric upset andweakness.  https://www.webmd.com/drugs/2/drug-11285-7061/metformin-oral/metformin-oral/details
[7]  While Hartford had access to Plaintiff's STD claim process, it did not provide a complete copy of the STD claim review process to Plaintiff.

phone call, Plaintiff also advised Hartford that he stopped work primarily due to the prostate cancer, and that after a second biopsy graded the cancer higher, he underwent focal cryotherapy.  Plaintiff stated he could not return to work because his urinary frequency and urgency required bathroom access no less than once an hour, and he could no longer remain in the operating room when necessary.  He added that medication had not helped the problem.  Plaintiff also advised Hartford that he started treating with Margurite Weisberg, a psychotherapist, for his emotional problems in addition to taking Xanax and Lexipro.[8]

45.     Dr. Qureshi examined Plaintiff on September 24, 2019, for urinary frequency and urgency, and anxiety.  Plaintiff's medical problems and medications had remained unabated.  Dr. Qureshi sent Hartford an APS on September 27, 2019,[9] which may also have been completed on September 24, 2019.  Among other things, Dr. Qureshi stated that the treatment plan was to continue selective serotonin reuptake inhibitor therapy, psychotherapy, treating with Dr. Lepor, and seeing a cardiologist about dizziness.

46.     Ms. Weisberg completed an APS on October 2, 2019.  The diagnoses were anxiety disorder and agoraphobia.  The response for self reported symptoms was depression, anxiety and lack of sleep.  Plaintiff's mental status exam findings were depressed and anxious mood, and only fair insight into his illness.  Ms. Weisberg concluded that Plaintiff's symptoms were severe enough to preclude occupational functioning; specifically, that prostate issues prevent Plaintiff from taking part in the

---

[8]Side effects of Lexipro, which is prescribed for depression and anxiety, include trouble sleeping, tiredness, drowsiness, and dizziness.  https://www.webmd.com/drugs/2/drug-63990/lexapro-oral/details. During the call, Plaintiff told Hartford that additional barriers to work were his emotional issues and trouble sleeping.

operating room with doctors, and his anxiety and agoraphobia.  Ms. Weisberg added that Plaintiff had no work ability at the time, and that it was unknown when he could be expected to resume working.  She noted that Dr. Qureshi was prescribing Lexapro.

47.     On October 21, 2019, Hartford's Peter Carleton, a psychotherapist from Maine, determined that Plaintiff's LTD claim was not supported.  Carleton predetermined that his review would reject Plaintiff's claim by stating Plaintiff's occupation required him to conduct sales calls, follow up on leads, sell products in an assigned territory, while omitting the occupation's primary requirement - that he remain in the operating room during surgery.

48.     The rationale for Carleton's decision completely evaded that Plaintiff's presence was required in the operating room during surgery.  Carleton noted that Plaintiff's STD benefits were exhausted based on prostate cancer.  However, Carleton claimed that Plaintiff's exam findings did not detail functional impairments; that Weisberg had only treated Plaintiff a few times; and that Plaintiff was not treating with a psychiatrist.  Carleton also said he did not have Weisberg's psychotherapy notes.

49.     Dr. Qureshi never stated that treating with a psychotherapist was inadequate.  Ms. Weisberg never stated that Plaintiff needed to see a psychiatrist because Dr. Qureshi was prescribing Lexapro and Xanax.  The LTD Plan has no requirement that a claimant treat emotional problems with a psychiatrist.  Carleton failed to explain why Plaintiff's prostate cancer, which was why he qualified and exhausted STD benefits, did not qualify him for LTD benefits.

50.     Carleton knew not to expect psychotherapy notes because they are protected from disclosure by HIPAA.  More importantly, while the LTD Plan mentions

---

[9] Plaintiff requested a copy of the entire APS, but Hartford refused to provide it.

mental examinations as an example of proof of loss that a claimant may submit, the only proof of loss that the LTD Plan can insist upon is an interview or exam with a representative, medical or vocational source of the LTD Plan's choosing.

51.     Most importantly, after noting that Plaintiff's STD benefits were exhausted based on prostate cancer, Carleton said that Plaintiff's projected return to work date was August 27, 2019.  Carleton made absolutely no attempt to explain what had changed, let alone improved, in order to show that Plaintiff had recovered the ability to resume working at his occupation.

52.     Hartford had Gloria Hoehne, a registered nurse, rubber stamp the Carleton review.  Hoehne's entire analysis was a single conclusory, boilerplate, sentence:  "The information on file at this time does not identify/evidence a functional limitation that would preclude claimant from performing his full time pre-disability physical/work activities from a physical perspective as of LTD CED ongoing."

## THE DENIAL LETTER

53.     On October 24, 2019, accepting what Carleton and Hoehne wrote, and rejecting what Dr. Qureshi, Dr. Lepor and Ms. Weisberg concluded, Hartford's Kristin Andrews decided that Plaintiff's LTD claim should be denied.  The following day, Hartford's claim manager, Amy Lamb, gave Andrews permission to proceed with the denial.

54.     The letter that Andrews sent Plaintiff on October 25, 2019, was three pages (the "Denial Letter"), and provided very little information.  The entire third page

were a description of appeal procedures.  Part of the first and the entire second page, were quotes from Hartford's certificate of insurance (the "Certificate").

55.     The entire explanation that the Denial Letter gave for saying Plaintiff was no longer disabled by his prostate impairment was: "While we acknowledge that you continue to have issue with frequency and urgency, on Myrbetriq, however no other treatment has been documented."

56.     Hartford admitted that Plaintiff's urinary frequency remained unchanged. Hartford admitted that Plaintiff's urinary urgency remained unchanged.  Hartford reported that the medication had not helped with the frequency or urgency.  No other treatment was documented because no other treatment was available.  Dr. Lepor could not offer any other treatment.  Hartford never offered any explanation as to how Plaintiff could perform the essential duty of remaining in the operating room when necessary.

57.     When Plaintiff asked Hartford to identify what other possible treatment it contended could possibly be expected for Plaintiff's urinary urgency and frequency, Hartford refused to answer.  Hartford's refusal to engage in a "meaningful dialogue," violated ERISA's requirement that an administrator inform Plaintiff as a plan participant of the information it sought.  That failure to provide for a reasonable claims process provides a third ground for applying a *de novo* standard of review.

58.     The entire explanation that the Denial Letter gave for saying Plaintiff was not disabled by his anxiety and depression also consisted of a single sentence:  "While it was documented you suffer from anxiety, depression with concentration problems and agoraphobia, the medical information is insufficient to determine a level of impairment." As an initial matter, Plaintiff's concentration problems were also due, if not primarily due,

to his concern about always needing bathroom access.  More importantly, Dr. Weisberg completed Hartford's APS form at Hartford's request, and she specified that Plaintiff's problems were severe enough to preclude him from working.

59.     The Denial Letter made a boilerplate assertion that Hartford needed additional information, which failed to provide any guidance, but simply made a vague request for additional information.  Once again, the Denial Letter's failure to provide any "meaningful dialogue" about how Plaintiff could perfect his claim violated ERISA's requirement for a reasonable claim review process.

60.     The Denial Letter stated that Hartford needed updated progress notes to understand Plaintiff's treatment plan.  However, Hartford's APS form specifically asked for Plaintiff's treatment plan, and Dr. Qureshi had provided it to Hartford less than a month earlier.

61.     Hartford had Dr. Lepor's medical records from February, March, April, and July 2019.  Hartford also already had Dr. Qureshi's progress notes from February, March, May, July and September 2019, just one month before the Hartford decided to deny Plaintiff's LTD application.  That is concrete proof that Hartford's claim that it needed updated progress notes after April 1, 2019, was wholly specious, and merely a manifestation of Andrews inserting a boilerplate provision from Hartford's denial letter template.

62.     The Denial Letter stated that Hartford needed pharmacy records, but Hartford already knew what medications had been prescribed for Plaintiff.

63.     The Denial Letter stated that Hartford needed diagnostic testing, but Hartford already had the PSA and biopsy operative reports concerning Plaintiff's

prostate cancer, and Hartford knows that diagnostic testing does not exist for anxiety and depression.  Moreover, the LTD Plan contains no requirement that particular tests be performed.  *Barbu v. Life Ins. Co. of America,* 35 F.Supp.3d 274, 278, 294 (E.D.N.Y. 2014)(rejecting insurer's insistence for testing as an attempt to impose "an extra-policy requirement.")

64.     Dr. Qureshi provided another APS on October 28, 2019.  The diagnoses were major depression, anxiety, prostate cancer, and vertigo.  Symptoms were anxiousness, feeling depressed, urinary frequency and urgency, vertigo and difficulty concentrating.  Test results were the prostate bioposy pathologies that revealed adenocarcimona, and a March 14, 2019 PSA.  The treatment plan was to continue selective serotonin reuptake inhibitor therapy, psychotherapy, and treating with Dr. Lepor and James Albanese, a cardiologist.  Dr. Qureshi specified that Plaintiff was "unable to work due to urinary symptoms, vertigo, dizziness, mental illness."  Dr. Qureshi concluded that Plaintiff should never bend, kneel, crouch, climb, lift any amount of weight for up to a third of the day, or use the upper extremity more than occasionally. Dr. Qureshi repeated that Plaintiff's condition had not changed, and it was unknown when his restrictions and limitations would end.

65.     Carleton reviewed Dr. Qureshi's APS on October 30, 2019.  Carleton claimed that Plaintiff seeing Weisberg and Qureshi monthly showed Plaintiff's anxiety and depression were not severe.  Carleton never identified any source, let alone a reliable one, who indicated monthly treatment was insufficient to treat severe depression or anxiety.  Carleton also claimed that because Plaintiff was not seeing a psychiatrist or psychologist, it showed Plaintiff's anxiety and depression were not

severe.  Carleton never identified any source, let alone a reliable one, that indicated seeing a psychiatrist or psychologist is needed to show Plaintiff's anxiety and depression were severe.

66.     Carleton claimed that Ms. Wesiberg could not support Plaintiff's claim because she was not a psychologist or psychiatrist, yet Carleton claimed that he could reject Plaintiff's claim even though Carleton was not a psychologist or psychiatrist.

67.     Carleton claimed that Plaintiff's anxiety symptoms did not show severe and persistent functional impairments, yet every report from Plaintiff's medical professionals stated the opposite, and Carleton never identified a single piece of medical evidence to the contrary.  Nor did Carleton identify any medical finding, test, or symptom, which indicated Plaintiff's anxiety had changed or improved.  Once again, Hoehne parroted, nearly verbatim, what Carleton wrote.

68.     Andrews sent Plaintiff a letter dated November 11, 2019, stating that Dr. Qureshi's latest APS had not changed Hartford's position.  Andrews also said that Dr. Qureshi's office notes from September 24, 2019, did not document any abnormal physical exam findings or focal deficits.  To the contrary, Dr. Qureshi's notes from that date stated that Plaintiff had urinary frequency and urgency, anxiety, stress, back pain, epicondylitis, dizziness, and prediabetes with obesity and high cholesterol.

69.     On November 12, 2019, Ms. Weisberg prepared a narrative report stating that she was treating Plaintiff because he was agoraphobic, anxious, and extremely depressed, which resulted in panic attacks and difficulty concentrating.  She noted that Plaintiff's having to care for his elderly sick parents, and both of his brothers' suicides,

contributed to Plaintiff's symptoms.  Ms. Weisberg unequivocally concluded that Plaintiff "is totally disabled and is unable to perform the duties of his occupational demands."

70.     The November 12, 2019 letter was given to Carleton to review.  He reiterated what he said when he reviewed Dr. Qureshi's APS on October 30, 2019. Hartford also said there was no evidence to support Plaintiff's inability to lift or carry 10 pounds, or stand, walk and sit on a full time basis.  Whether Plaintiff could lift or carry 10 pounds is not relevant because his occupation was light, which requires lifting or carrying up to 20 pounds.  Furthermore, the issue is not whether Plaintiff could sit, stand and walk, but whether he could remain in the operating room when needed during surgery.

71.     Andrews sent Plaintiff a letter dated December 5, 2019, stating that Dr. Qureshi "sent in new records on October 28, 2019, November 14, 2019 and November 26, 2019."  While Dr. Qureshi faxed her APS to Hartford on October 28, 2019, she never submitted any records on November 14, 2019 or November 26, 2019. Nonetheless, Andrews claimed that Hartford reviewed all of that new information, and could not approve the claim.  The only references in the file that Hartford provided Plaintiff relating to November 14, 2019 or November 26, 2019 were internal notes by Hartford representatives about whether to refer Ms. Weisberg's November 12, 2019 narrative report to a consultant.

72.     Andrews' letter dated December 5, 2019, also stated that Plaintiff's deadline to appeal was April 22, 2020.

73.     On February 5, 2020, Andrews denied Plaintiff's request for a 90 day extension to prepare his appeal.

74.    On February 19, 2020, Plaintiff requested a 30 days extension beyond April 22, 2020.  Hartford never agreed, nor even provided Plaintiff with an answer. Plaintiff filed his appeal on April 11, 2020.

## PLAINTIFF'S APPEAL EVIDENCE

75.    Plaintiff provided Dr. Lepor's progress notes to date, including a five page report from his examination on October 22, 2019.  However, the purpose of progress notes is to remind a doctor about what he might want to remember the next time he sees a patient; not to serve as evidence for a legal proceeding.  That is why Hartford requires treating doctors to complete APS forms, because Hartford knows that progress notes provide limited information.

76.    Plaintiff provided Hartford with a report from Dr. Lepor, which summarized his medical findings and opinions.  He diagnosed Plaintiff with chronic urinary urgency and frequency.  Dr. Lepor specified that Plaintiff has those symptoms about "15 times per day, which interferes with his ability to stay in the operating room for long periods at a time," and would need at least hourly 10 minute breaks when working.  Dr. Lepor reported that Plaintiff's fatigue level is moderate, and referred him to a urinary specialist, but that specialist did not help Plaintiff's symptoms.  Dr. Lepor concluded that Plaintiff's symptoms would interfere with Plaintiff's concentration and attention frequently, would render Plaintiff off task at least 21% of the time, and would result in Plaintiff missing at least 3 days of work a month.  Pads or protective briefs would not enable Plaintiff to work in the operating room during surgery because he has urgency and frequency and

not incontinence.  Perhaps most importantly, Dr. Lepor stated that Plaintiff chose riskier surgery in the hope of avoiding urinary symptoms.

77.     Plaintiff provided Hartford with a report from Dr. Qureshi's that summarized her medical findings and opinions.  She diagnosed Plaintiff with urinary urgency/incontinence, and stated that he routinely sees a urologist for chronic urinary urgency and frequency.  Dr. Qureshi concluded that Plaintiff's symptoms limited his ability to concentrate, perform his work tasks, and perform his daily activities.  Dr. Qureshi rated Plaintiff's exhaustion as severe, and said that exercise and lifting cause his urinary incontinence.  Dr. Qureshi averred that Plaintiff cannot work in an operating room during surgery with pads or protective briefs.  She explained that Plaintiff could not perform his work and assist the surgeon because Plaintiff cannot delay bladder control, and would need unscheduled and unpredictable breaks at least once an hour.  Dr. Qureshi concluded that Plaintiff's symptoms would interfere with his concentration and attention continuously, would render Plaintiff off task at least 21% of the time, and he would miss work altogether.  Perhaps most importantly, Dr. Qureshi stated that Plaintiff chose riskier FA surgery in the hope of avoiding urinary symptoms.

78.     Plaintiff also provided Dr. Qureshi's office notes from December 11, 2019 through March 4, 2020.  Dr. Qureshi's latest office note stated that Plaintiff cannot work due frequent urination with hesitancy and occasional incontinence.

79.     Plaintiff provided Hartford with a report from Ms. Weisberg that summarized her medical findings and opinions.   She diagnosed Plaintiff with persistent depressive disorder and generalized anxiety disorder, which she said prevents him from being able to do full time work.  She identified the objective clinical findings: significantly

restricted, repetitive patterns of behavior, activities or interests; sleep disturbance; diminished interest in almost all activities; feelings of guilt/worthlessness; appetite disturbance with change in weight; difficulty thinking or concentrating; decreased energy; muscle tension; depressed mood; restlessness; irritability; distractibility; easily fatigued; panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; and disproportionate fear or anxiety about using public transportation and being in a crowd.  Ms. Weisberg specified that Plaintiff lacked the abilities to: work at a consistent pace; maintain attention and concentration; perform work on schedule; sustain ordinary attendance and punctuality; ignore distractions; make simple work related decisions; complete a normal workday without needing more than the allotted number or length of rest breaks and an unreasonable number and length of rest breaks.

80.    Ms. Weisberg concluded that Plaintiff could not handle even low stress work due to his anxiety and depression.  Consistent with Dr. Lepor and Dr. Qureshi, Ms. Weisberg concluded that Plaintiff's medical impairments would render him off task at least 21% of the time, and would result in him missing at least 3 days of work a month.

81.    Plaintiff subjected himself to an independent medical examination, which Jessica Powers, a psychologist, performed on March 2, 2020.  Dr. Powers' findings and conclusions were consistent with those of Ms. Weisberg.  Dr. Powers' ultimate conclusion was that Plaintiff:

> shows all symptoms of persistent depressive disorder (dysthymia) and generalized anxiety disorder, with panic attacks.  He is not able to work at this time since he experiences severe impairment in sustained concentration and problem solving due to sleep deprivation, depressive symptoms and anxiety.  At this time, his tolerance for stress is so low that returning to work would put him at risk of an episode of decompensation.  Disproportionate anxiety is experienced

when he is in a crowded place and when he has to leave home.  He is also unable to complete a normal workday due to the number of bathroom breaks he must take.  His panic attacks and crying episodes are unpredictable at times and would interfere during a work day.

82.    Plaintiff provided a letter from Vincent Omelio, who was Plaintiff's boss at the Employer.  Mr. Omelio made clear that Plaintiff was terminated solely because of his medical problems.  Mr. Omelio said Plaintiff was a good employee, and performed all of his job requirements without any issues.  However, after his prostate cancer, Mr. Omelio said Plaintiff became increasingly depressed, and following his prostate surgery he began experiencing urinary urgency and frequency.  Critically, Mr. Omelio explained that the urgency and frequency was problematical because Plaintiff's job required him to be in the operating room for extended periods of time.

83.    Plaintiff provided a letter from Dr. Vito Rizzo, who was one of Plaintiff's customers at the Employer.  Dr. Rizzo stated that Plaintiff was required to have intimate knowledge about the use and application of equipment and products that are essential to the management of conditions and deformities of Dr. Rizzo's patients.  Most of Dr. Rizzo's patients require surgery, during which Plaintiff was an essential member of the care team, and his attendance and active participation was needed.  Importantly, Dr. Rizzo maintained that many times surgery involved several hours of uninterrupted operating time.

84.    Dr. Rizzo specified that Plaintiff's urinary urgency and frequency was uncontrolled, forcing him to excuse himself from the operating room, which could occur at a critical moment in the surgical procedure.  As the surgeon responsible for procedure success, Dr. Rizzo stated Plaintiff's urinary urgency and frequency created an unacceptable situation as this can cause procedure flow disruption and prolonged

time under anesthesia.  Consequently, Dr. Rizzo declared that as far as he was concerned, Plaintiff was no longer capable of performing the requirements of his position, and contended that he should be considered permanently disabled.

85.     Plaintiff provided a letter from Derik Malia, who was one of Plaintiff's co-workers at the Employer.  Mr. Malia stated that Plaintiff's cancer and caused a noticeable reduction in his attitude and enthusiasm at work.  Significantly, Mr. Malia pointed out that due to the side effects of Plaintiff's condition, some doctors expressed concern because Plaintiff needed to leave the operating room for repeated restroom breaks.  Mr. Malia explained that their job is to be a partner with physicians and operating room staff during surgery, and they cannot be absent during critical parts of procedures, which last between 2-6 hours.

86.     Reflecting what Mr. Omelio stated, Mr. Malia also stated that Plaintiff was let go from the Employer because he had to keep leaving the operating room.  Mr. Malia explained that because being in the operating room is 75% of the job, if you cannot be present 100% of the time in the operating room, then you are of little use to the Employer.

87.     Plaintiff provided Hartford with a letter from his wife, Maria Grella, who has the opportunity to observe Plaintiff more than anybody else.  She noted how even trying to enjoy a night at home watching a movie is difficult for Plaintiff because he is constantly in need of using the bathroom, so they must continually pause the movie to address the problem.  Ms. Grella said that whereas Plaintiff used to be able to multitask and excel at anything, he is now withdrawn and sad with a short attention span and has difficulty concentrating.  She also noted how Plaintiff either cannot fall asleep or sleeps

too many hours.

88.    Plaintiff submitted a vocational evaluation from Ruth Baruch, M.S., C.R.C.

Ms. Baruch ascertained that Plaintiff's job was a composite one, consisting of tasks that

most closely matched two occupations in the Dictionary of Occupational Titles ("DOT").

The first job is Sale Representative, Medical Equipment, DOT 276.257-010, which

occupation is generally performed as Light work, but Plaintiff's job required that he

perform it at the more physically demanding medium level, and that occupation is skilled

work with an SVP of 6.  The second job is biomedical Equipment Technician, DOT

019.261-010, which occupation is generally performed as Light work, but as noted

above, Plaintiff's job required that he perform it at the medium level, and it is also skilled

work with an SVP of 6.

89.    The DOT titles have not been updated since 1991.  The U.S. Department

of Labor updated the DOT with O*Net, which describes Plaintiff's position as Sales

Representatives Medical Code 41-4011-00.05.  Plaintiff's position is performed quite

differently than as described in the DOT.  Ms. Baruch explained that surgical equipment

medical sales representatives are typically responsible for instructing the medical staff

in the proper use of the equipment, which requires that they be available to attend

surgical procedures on a regular and consistent basis.  Additionally, they must be able

to multitask, be extremely detail orientated, be reliable, and able to handle stressful and

unpredictable situations.

90.    Ms. Baruch concluded that Plaintiff would be unable to perform one or

more of the essential duties of his occupation.  Given that Plaintiff's symptoms were

uncontrollable and unpredictable in nature, Ms. Baruch determined that Plaintiff would

not be able to attend to the required demands of a medical sales representative.  He would not be able to sustain the long hours in the operating room without leaving numerous times over the course of a surgery to urinate.  Additionally, changing his cap and gown and peripheral wear would be extremely time consuming.  Wearing a diaper undergarment would create a stench, be unsterile, take additional time to change and create embarrassment, which would compromise Plaintiff's focus and attention.  As reported, when Plaintiff has to relieve himself, that is all he can think of until he reaches his destination.

91.     Plaintiff's skilled position was highly detailed and demanding.  Physician's relied on Plaintiff's expertise.  Surgical errors could occur if Plaintiff is not completely focused in the operating room, which would be significantly problematic.  Therefore, Ms. Baruch opined that Plaintiff would not be able to perform and sustain his skilled occupation because it was a position that required Reasoning, Mathematic, and Language levels beyond his current capacity.

92.     Ms. Baruch also concluded that Plaintiff's inability to maintain attention and focus due to symptoms of urinary urgency and frequency would prevent him from being able to perform and sustain his skilled occupation because he would not be able to maintain the pace and persistency that it requires.  Ms. Baruch explained that it is quite evident that Plaintiff lacked the stamina and quick response reaction time required of a medical sales representative who is responsible for overseeing the proper use of medical equipment in the operating room, which could potentially lead to life threatening mistakes.

93.     Ms. Baruch also found that Plaintiff's position required extensive travel, for which he would often not have ready access to a bathroom.  Ms. Baruch stated that travel was also an essential duty of Plaintiff's occupation that he could not perform.

94.     Plaintiff's extensive work history is objective proof that substantiates the credibility of his complaints.  Common sense dictates that anyone who works for as long as Plaintiff did, especially when earning $100,000 annually, only stops working because they can no longer continue to do so.  "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."  *Rivera v. Schweiker,* 717 F.2d 719, 725 (2d Cir.1983); *Tarsia v. Astrue,* 418 Fed.Appx. 16, 19 (2d Cir. 04/07/2011)(same).


## PLAINTIFF'S CAUSE OF ACTION
## FOR LONG TERM DISABILITY BENEFITS

95.     Plaintiff repeats each and every allegation contained in paragraphs 1 through 94 as if set forth fully herein.

96.     Fiduciaries are statutorily obligated to perform their duties prudently, solely in the interest of plan participants and beneficiaries, and strictly in conformance with the provisions of the plan.  Fiduciaries also have a statutory obligation to interpret and construe the terms of the plan fairly, and make decisions in accordance with plan language.

97.     Hartford has a financial conflict of interest arising from its dual role as an ERISA plan administrator and payer of plan benefits, which caused Hartford to breach it fiduciary obligations to Plaintiff.

98.    Hartford failed to render its decisions in accordance with the relevant terms and definitions of the Policy.

99.    Hartford's decision to deny LTD benefits was not supported by substantial evidence, did not comply with the Policy language, and was tainted by its conflict of interest.

100.    Hartford failed to use a reasonable claim process when reviewing Plaintiff's LTD application.

101.    Plaintiff was and remains disabled within the terms and conditions of the LTD Plan, and therefore, is entitled to receive monthly disability benefits from the completion of the elimination period to the present.

102.    As Plaintiff was and remains disabled within the terms and conditions of the LTD Plan, Plaintiff is entitled to benefits after the elimination period to the present.

103.    Plaintiff is entitled to continued benefits on a monthly basis as long as there is no change in Plaintiff's medical test, exam findings or symptoms that demonstrate functional improvement.


**WHEREFORE,** Plaintiff respectfully requests this Court to:

A.    Declare and determine that Plaintiff became disabled as of February 17, 2020 under the LTD Plan, and continues to be disabled under it;

B.    Clarify that Plaintiff will be entitled to future benefits under the LTD Plan absent evidence of a change in the medical evidence that shows a functional improvement;

C.      Order Hartford to compensate Plaintiff for his disability in accordance with the terms of the LTD Plan;

D.      Award Plaintiff penalties pursuant to 29 U.S.C. § 1132(c)(1);

E.      Award Plaintiff attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

F.      Grant Plaintiff such other necessary and proper relief, including prejudgment interest, costs and disbursements, as to which he may be entitled.

Dated:  Jericho, NY
        May 27, 2020

LAW OFFICES OF JEFFREY DELOTT

By:     _Jeffrey Delott_

        Jeffrey Delott, Esq.

        Attorneys for Plaintiff
        366 North Broadway
        Suite 410
        Jericho, NY  11753
        (888) 572-0861